DIEGO INVESTORS - IV, E. C. SMITH, TAX MATTERS PARTNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Diego Investors - IV v. Commissioner
Docket Nos. 16947-87, 25289-87, 35488-87
United States Tax Court
T.C. Memo 1989-630; 1989 Tax Ct. Memo LEXIS 630; 58 T.C.M. (CCH) 753; T.C.M. (RIA) 89630; November 27, 1989
Mitchell B. Dubick, Sherri A. Groveman, Patrick J. Felix III, and Edward C. Smith , Jr., for the petitioners. Steven New, Zuzana Colaprete, Jeffrey A. Hatfield, Boris Siegel, and William H. Quealy, for the respondent. *632 GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: These three consolidated test cases involve deductions and credits claimed by petitioners and, in some instances, additions to tax determined by respondent in connection with audio master tape leases. [2] Respondent disallowed claimed deductions and credits with respect to 33 partnerships involved in these related ventures, and with respect to certain individual partners. Some of the cases involve individual partners because their partnerships do not come within the purview of the partnership audit provisions of sections 6221 through 6233 of the Internal Revenue Code. The three test cases were selected by the parties as representative cases that will aid in obviating or minimizing the need for additional litigation. *633 FINDINGS OF FACT Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years at issue. All rule references are to the Tax Court's Rules of Practice and Procedure. The stipulations of facts and attached exhibits are incorporated by this reference. Diego Investors IV (Diego) is a California general partnership formed in 1983. Edward C. Smith, Sr. (Smith), is and at all relevant periods was the Tax Matters Partner (TMP) and general managing partner of Diego Investors IV. At the time its petition was filed, Diego's principal place of business was San Diego, California. Beach Investors 400 (Beach) is a California general partnership formed in 1983. James Maxham (Maxham) is and at all relevant periods was the TMP and managing general partner of Beach Investors 400. At the time its petition was filed, Beach's principal place of business was Huntington Beach, California. James Mason (Mason or petitioner, when referred to in the singular) is and at all relevant periods was a general partner in Iowa Partners III (Iowa), a California general partnership formed in 1981. Smith was and remains the managing general partner *634 of Iowa Partners III. At the time his petition was filed, Mason's residence was San Diego, California. Spruce Fork, Inc. (Spruce Fork), a Florida corporation, leased all the master recordings to the partnerships in this case. Generally, and as will be described in more detail below, the master recordings were abridged literary works. There is an extensive background to the leasing transactions and a large number of participants. As general background, the master tapes were produced by one of three entities controlled by William Palmer (Palmer). The masters were then purchased by Spruce Fork, controlled by Steve Chios (Chios). The partnerships here involved then leased the masters from Spruce Fork and simultaneously entered into distribution agreements, first with Hear-A-Book, controlled by Norman Ross (Ross), and later with Scarlet Productions, Inc., controlled by Smith. Production
At one time or another during the late 1970's until approximately 1980, Palmer, Chios, and Ross all worked for Norwood Industries (Norwood), a manufacturer of a specialized audio cassette player and recorder. Although Palmer, Chios, and Ross all worked at Norwood, they were not necessarily *635 friends or well acquainted. Smith became acquainted with Norwood in the late 1970's. During that period, Norwood entered the market for literary works on tape. The tapes Norwood produced were specialized and of limited use. To listen to Norwood tapes, a consumer would also have to obtain a relatively expensive Norwood tape-playing machine. After leaving Norwood in July 1980, Palmer was contacted by Chios about producing master audio literary tapes. The masters would be duplicated onto standard cassettes, as opposed to the specialized Norwood system. Chios planned to purchase the tapes Palmer produced. Chios purchased the stock of a dormant corporation (Spruce Fork) from Palmer and used it as the vehicle to purchase the master tapes from Palmer. In November 1980, Palmer formed Audio Literature Group, Ltd. (ALG), a limited partnership, to produce master audio tape recordings for sale exclusively to Spruce Fork. Palmer was the sole general partner of ALG, and ALG's principal place of business was Riviera Beach, Florida. ALG produced master tapes for sale to Spruce Fork in 1980 and 1981. Palmer formed Audio Entertainment, Ltd. (AEL), a limited partnership in 1982 for the purpose *636 of producing master tapes to sell to Spruce Fork. Palmer organized Sound Entertainment Corporation (SEC), a Nevada corporation, in 1982 for the initial purpose of being AEL's general partner. In 1983, SEC produced master tapes for sale to Spruce Fork. ALG only produced and sold tapes in 1980 and 1981. AEL and SEC only produced and sold tapes in 1982 and 1983, respectively. The master tapes were produced during the time period from November 15 to December 31 of the respective years involved. All of the literature titles selected for production were in the public domain. Therefore, Palmer's partnerships would not have to pay copyright royalties. The production entities contracted with different studios to create the master tapes. Dave Gordon produced all the master tapes for ALG, AEL, and SEC. The cost for studio time, including tape and actor/readers, was $ 160 per finished hour of master tape in 1980, $ 185 to $ 200 in 1981, and a maximum of $ 250 in 1983. The length of a finished master tape was 1 to 1-1/2 hours. There were also additional costs and overhead incurred in producing the tapes. Dave Gordon was paid approximately $ 500 per title for production. Many of the *637 titles required abridgement to fit into the 1-1/2 hour format. Palmer kept records of the production and overhead costs for each master tape. Palmer's records indicate the following direct costs for the master tapes leased by the partnerships (records for some tapes were not available): Land of the Ironclads
$   620.00
Hard Times
1,405.86
Lady and the Tiger
620.00
Plattner Story
620.00
God of His Fathers
620.00
Story of My Life
1,151.15
Sea Raiders
570.00
The above costs do not reflect overhead or Dave Gordon's fee. Palmer's records are substantially complete and accurate. The Palmer entities produced over 200 master audio tape recordings for sale to Spruce Fork from November 1980 through December 1983. Sales to Spruce Fork
The sales from the Palmer entities to Spruce Fork always occurred during the last 3 days of the year. The prices of the master audio tapes leased by the partnerships were as follows: Diego
Price
Land of the Ironclads
* $ 1,200,000
The Plattner Story
The Lady and the Tiger
The God of His Fathers
Hard Times
Beach
The Story of My Life
* 515,000
The Sea Raiders
Iowa
The Case of the Resident Patient
210,000
The Case of Black Peter
210,000
The Case of the Engineer's Thumb
210,000
Pinocchio
250,000
Aladdin
210,000
Frankenstein
265,000
*638 The purchase price for each master tape was paid with a combination of cash, a short-term note, and a long-term, ostensibly recourse, note. The amount of the cash down payment and short-term note covered the cost of production, overhead, and a profit to the Palmer entities. The long-term notes bore interest at 8 percent per annum and were due 10 years after the date of sale. Eight percent was below the prime rate for all years involved. The prime rate was near 20 percent in 1980 and 1981 and did not fall to the 10-percent level until 1984 or 1985. Payments required on the notes were equal to a percentage of proceeds the purchaser might receive from exploitation of the master. The sole security for the notes was each of the subject master recordings. The short-term notes exchanged for the tapes, which were eventually leased to Iowa, apparently did not bear interest. The short-term notes for the tapes eventually leased to Diego bore interest at 8 percent. The short-term notes were due from 1 to 6 months after the date of purchase. The terms for purchase of the master tapes in issue *639 are as follows: Partnership
Price
Cash
Short-term Note
Long-term Note
Diego
$ 1,200,000
$ 10,000
$ 21,518
$ 1,168,482
Beach
515,000
5,000
9,250
500,750
Iowa (titles abbreviated):
Patient
210,000
10
4,875
205,115
Peter
210,000
10
4,875
205,115
Thumb
210,000
10
4,875
205,115
Pinocchio
250,000
20
6,730
243,250
Aladdin 210,000
10
4,875
205,115
Frankenstein
265,000
50
7,450
257,500
The Palmer entities did not file Uniform Commercial Code Forms UCC-1 (financing statements) to perfect their security interest in the master recordings. The sales agreements did not include certain standard clauses used in the recording industry, including: (1) A requirement that Spruce Fork perform in any manner; (2) a requirement that the masters be duplicated; (3) a requirement that any duplicates be marketed; (4) a requirement that the masters be insured; (5) safety and security requirements for storage of the masters; and (6) a requirement that the masters not be altered or edited. The sales agreements erroneously included the statement that the Palmer entities owned *640 all the rights to publish or otherwise reproduce the works of the author. Neither Palmer nor any other entity could own such rights, because the works were in the public domain. Spruce Fork either commissioned or obtained appraisals of the master audio tapes. The appraisers were Gene Block, Gershan Thalberg, and Len Levy. The appraisers were "generic" and identical to each other with the exception of the name and the purchase price. The Block and Levy appraisals were also substantially similar to one another. Each stated the value was in excess of the purchase price. The value was contingent on "full utilization of the proper promotional and distribution channels * * *." The appraisals also included the statement that 12 years was a reasonable life span for the work. Leasing Program
In 1980, Spruce Fork initiated a leasing program of audio literature master recordings purchased from ALG. The 1980 program was mainly leased to individuals. From 1981 to 1983, Spruce Fork leased to various partnerships. Two forms of offering literature were used for the leasing program. The first contained articles and letters concerning the "audio cassette revolution," form appraisals *641 like the ones obtained by Spruce Fork, lease agreements, and a tax opinion. The second type of offering literature (prospectus) contained pictures of newspaper articles concerning books on tape and the following: 198() [applicable year] LEASING PROGRAM 400% WRITE-OFF THERE ARE NO NOTES FOR YOU TO SIGN COMPLETE LEGAL OPINION - IN COMPLIANCE WITH TAX LAWS DEMONSTRABLE ECONOMICS Later in the prospectus was a list of applicable Internal Revenue Code sections. Another page, involving "estimated tax aspects," reflecting a $ 70,500 "effective deduction" for a $ 17,500 investment. The "effective deduction" consisted of $ 17,500 rent and promotional expense deductions and a $ 26,500 investment tax credit (ITC). This was for a master valued at $ 265,000. For masters valued at $ 210,000, the prospectus promised an "effective deduction" of $ 55,700 for a $ 13,700 investment, consisting of $ 13,700 rent and promotional expense deductions and a $ 21,000 ITC. During 1976, Smith began a tax preparation business in the San Diego area. Smith first learned of the Spruce Fork program when a tax preparation client brought him some Spruce Fork literature during 1979 or 1980. Initially, *642 Smith was not satisfied with the marketing aspects of the program and he did not recommend it to his clients. Hear-A-Book, formed in 1981, provided what Smith thought would be adequate marketing for master tapes. After meeting with Norman Ross, president of Hear-A-Book, Smith became involved in the tape leasing program. Smith recommended the 1981, 1982, and 1983 leasing programs to his tax preparation clients and represented them as a "good tax program and a good investment program." Smith organized partnerships composed of his tax preparation clients to which master tapes were leased. He received a 3-percent consulting fee for forming the partnerships, which he reinvested in each partnership. Therefore, Smith became a partner in each partnership, except the Beach partnerships formed by Maxham. In effect, Smith made all the business decisions for the partnerships, including the Beach partnerships. Smith received about 25 or 26 percent of commissions from Spruce Fork lease payments. Smith decided which titles each partnership would lease. He chose particular titles by consulting publications listing historic sales of books of each title. Iowa - entered into a 10-year lease *643 agreement dated October 19, 1981, regarding 6 master audio tapes from Spruce Fork. The lease agreement required a $ 34,950 payment in the first year, $ 34,950 in the second year, and starting in the second year, 70 percent of any receipts from exploitation of the master. Spruce Fork elected to pass through basis of $ 1,355,000 in qualified property to enable Iowa, the lessee, to claim ITC on behalf of its partners. Iowa leased the following master recordings from Spruce Fork: Number of
Name
Author
Readers
The Case of the Resident Patient
Arthur Conan Doyle
1
The Case of Black Peter
Arthur Conan Doyle
1
The Case of the Engineer's Thumb
Arthur Conan Doyle
1
Pinocchio
Carlo Collodi
1
Aladdin
1
Frankenstein
Mary Shelley
1
Diego - entered into a 10-year lease agreement with Spruce Fork dated December 30, 1983, regarding 5 master audio tapes. The lease agreement required a $ 31,650 payment in the first year, a like amount in the second year, and starting in the second year, 70 percent of the receipts from exploitation of the master. Spruce Fork elected to pass through $ 1,200,000 of basis for ITC purposes. Diego leased *644 the following master recordings from Spruce Fork: Number of
Name
Author
Readers
The Ironclads
H. G. Wells
1
The Plattner Story
H. G. Wells
1
The Lady and the Tiger
F. Stockton
1
The God of His Fathers
Jack London
1
Hard Times
Charles Dickens
4
Beach - entered into a 10-year lease agreement with Spruce Fork dated December 30 (apparently 1983) regarding 2 master audio tapes. The lease agreement required a $ 13,700 payment in the first year, a like amount in the second year, and starting in the second year, 70 percent of the receipts from exploitation of the master. Apparently Spruce Fork also elected to pass through qualified basis so that Beach could claim the ITC. Beach leased the following master recordings from Spruce Fork: Number of
Name
Author
Readers
The Story of My Life
Helen Keller
1
The Sea Raiders
H. G. Wells
1
Based on a royalty to be paid by the distributor, Hear-A-Book, Smith represented to investors that the break-even point for the lease was approximately 35,000 unit sales per master title (35,000 times $ 1.35 times 30 percent equals $ 14,175). Smith also represented *645 that he expected investors to recoup 2 to 3 times their cash investment. Distribution
Hear-A-Book (HAB) was formed in early 1981 by Norman Ross at Palmer's request. Late in 1980, Palmer approached Ross, his co-worker at Norwood Industries, and suggested that Ross form a company to produce, market, and distribute cassette tapes made from the master recordings sold to Spruce Fork. Palmer advanced HAB $ 5,000 because Ross did not have enough capital to start the business. Although the distribution agreements were between HAB and lessees of tapes, in essence, Palmer and Chios set the terms for the HAB distribution agreements. The lessees were to receive royalties and Spruce Fork was to receive rent from HAB for each cassette sold. The initial royalty was $ 1.35, dictated to Ross by Palmer and Chios on a "take it or leave it" basis. Concurrent with Iowa's lease of the master tapes in 1981, Iowa entered into a distribution agreement with HAB. HAB agreed to pay $ 1.35 per tape for each cassette sold. In addition, Iowa agreed to pay $ 2,500 per title as a distribution fee. Distribution fees of this type (paid up front) are not standard in the recording industry. The initial *646 distribution agreement was for 1 year and was automatically renewable, unless terminated by either party by providing notice 60 days prior to the end of the 1-year term. HAB did not have production facilities or access to retail outlets. It contracted with outside production facilities to produce cassettes from the masters. In the earlier programs, cassette tapes were to be distributed by outside and unrelated companies which marketed by catalog to different retail outlets. The original retail price for the tapes was $ 6.95 for single or $ 8.95 for double cassettes. The discount given to distribution companies was between 50 and 60 percent of the retail price. HAB handled approximately 44 titles for Smith's partnerships in 1981. Ross expected sales of 4,000 to 5,000 units per title per year. From the beginning, HAB encountered economic difficulties. Its direct production costs of $ 1.25 per tape, along with the $ 1.35 per tape royalty, were too high for HAB to operate profitably. In addition, Smith was dissatisfied with tardiness concerning royalty payments. Because HAB sold to the distributor on a guaranteed return basis, the possibility of returns further retarded HAB's *647 payments to Smith's partnerships. Eventually, the $ 1.35 royalty was reduced to 50 cents, with HAB no longer having exclusive rights to distribute. In 1985, HAB filed for bankruptcy, largely due to lack of market interest in the Spruce Fork titles. HAB produced, but did not necessarily sell, in total, approximately 25,000 to 32,000 cassette tapes for the Smith partnerships. According to HAB records, HAB, in total, sold 299 tapes from the masters which had been leased to Iowa. Smith's dissatisfaction with HAB caused him to organize Scarlet Productions, Inc. (Scarlet), in early 1982, originally just to reproduce tapes from the masters, and later in 1982 to market and distribute tapes. Prior to organizing Scarlet, Smith had no experience in duplicating or marketing audio cassette tapes. Smith either solicited or caused lessees of masters to switch distributors from HAB to Scarlet. In addition, for the 1982 and 1983 leasing programs, Smith caused the partnerships to enter into distribution agreements with Scarlet, which were similar to the HAB distribution agreements. The distribution fee was $ 2,500 per title in 1982, and $ 3,000 in 1983. The royalty was 90 cents per tape sold. *648 Smith discontinued his tax preparation business in 1984 to devote full time to the activities involving Scarlet. Scarlet had similar and, in some ways, more vexing problems than HAB. Initially, Scarlet did not have any production equipment. Not until 1984, with the assistance of James Reep, did Scarlet purchase production equipment and start producing tapes. Reep had a part-time business duplicating audio and videotapes before he was retained by Scarlet. When finally produced, the packaging was not appealing, and the artwork was amateurish. On occasion, the wrong tape was placed in the package. Scarlet had similar marketing and distribution problems. Smith retained Gene Block (Block) as a consultant, paying him $ 2,500 per month. Block had been associated with another company's efforts to make children's books on tape. Supposedly, Block had a distribution network and means to cause tapes to be marketed in larger chain store operations. Block's efforts, if any, did not succeed. Smith also tried other means to market the tapes. He contacted Newman Communications, who wanted a medium-priced line of books on tape. These efforts fell through. In addition, he contacted Century *649 Publishing about marketing the tapes. Century had the tapes appraised and concluded the masters would need remastering to reduce machine noise and otherwise upgrade their substandard quality. On a trial basis, Century designed new packaging that was radically different from and more professional than Scarlet's packaging. However, the Century contacts did not materialize. Scarlet had a more successful relationship with Warner Audio Publishing (Warner). On February 25, 1985, Scarlet entered into a distribution agreement with Warner wherein Warner acquired certain rights to sell and distribute cassettes from approximately 220 master titles. The royalty under the Warner agreement was 25 cents per tape. Warner evaluated a number of the master recordings covered under the agreement to determine which titles, if any, to select for reproduction and marketing. Only 8 titles were selected. The master recordings evaluated but not selected were either of poor quality or deemed not profitable. None of the 8 titles selected are the masters leased by any of the test case partnerships. Warner remastered all 8 of the titles to cure sound defects and generally improve their quality. At about *650 the same time as the Warner negotiations, Smith tried another avenue to market the tapes. Scarlet would sell distributorships, which it advertised in national newspapers. Scarlet employed Larry Ballard (Ballard) to sell distributorships. According to the plan, Ballard, or someone hired by Ballard, was to locate shops and bookstores willing to place a rack of the tapes in their establishment. The distributor would purchase racks from Scarlet to be placed in preselected locations. Ostensibly, the distributor would retain profits from any tapes sold. The distributorships were to supplement or initiate Block's efforts to place the tapes in large chain stores. The distributorships also failed, and a good deal of ill will was generated between Smith and some of the distributors. Ballard used the remastered Warner tapes for demonstrations to prospective distributors. In some cases, the distributor understood that he would be able to pick titles of his choice. Ballard also represented that the tape display and sales racks would be equipped with "headers" (a sign or placard placed on a rack reflecting the names or titles of the tapes). Finally, Ballard represented that a number of *651 other tapes, "subliminal self-help" tapes, would soon be available to the distributors. While Scarlet had negotiated with a company to market those tapes, no agreement or contract was ever reached and Scarlet did not receive any self-help tapes for distribution. When the tapes were received by distributors, some tapes were in the wrong packages. In addition, they were in the same amateurish "Scarlet packaging," as opposed to the more professional "Warner packages" which the potential distributor had been shown. Only about 87 of the more than 200 titles were included. No self-help tapes were received by distributors. The racks came without headers. Finally, the locators had not found many locations to put the racks. After 2 or 3 months, due to lack of sales, the distributors were usually asked by the store owner to remove the racks. At least one distributor obtained a judgment against Scarlet for breach of contract. Scarlet did not sell any copies of titles leased by Diego. Scarlet sold an indeterminate number of The Sea Raiders, leased by Beach, to distributors. A total of 745 tapes from Iowa masters were sold, 299 by HAB and 446 by or to distributors. The Master Tapes
*652 The quality of the master recordings was generally poor. The tapes contained substantial background noise or hissing sounds. Music was sparingly used. Generally, only a few of the titles had music and usually only at the beginning and end or as transition in the story. As recorded, the music tended to break up and to take away from, rather than enhance, the story. On most of the titles, only one voice was used, although some had multiple voices reading the different parts. Two of the titles chosen by Warner, Sons and Lovers and The Brothers Karamazov, had more than one reader. There was extreme variation in the recording time on each side of a cassette. For example, side 1 of The Plattner Story ran 30 minutes, side 2 ran 15 minutes. The abridgement of the works, or the lack of it, was awkward. For example, the Sherlock Holmes stories were read almost verbatim, and were too long, while Hard Times, by Charles Dickens, was extremely abridged and sacrificed characterization and emotion to force the entire plot. Finally, there was some apparent confusion in the agreements regarding copyright attribution on all the tapes. Scarlet's basic inventory of tapes was not diverse. *653 There was limited variety of authorship -- 30 Sherlock Holmes stories, 17 H. G. Wells stories, 18 by Jack London, etc. Such a collection of titles would not appeal to a broad audience. Normally, bookstores have small inventories of classics. Further, because no author's works are of uniform quality, using the total output of some writers resulted in books that represented less than the best potential of those authors. Because the works were in the public domain, anyone could produce audio tapes of the works, engendering competition and lessening uniqueness and value. Audio literature tapes are offered in various price ranges. Tapes that command high prices and relatively large audiences usually have one or more of the following characteristics: (1) The book is a recent best-seller; (2) the book has been made into a movie or television show or series; (3) the author is reading the work; (4) the tape offers practical suggestions for coping with business or personal problems; (5) the tape incorporates exercises or other health-related instructions; (6) a famous actor or actress is reading the work; or (7) the tape has been well-reviewed in the appropriate media. *654 None of the above criteria were applicable to the master tapes involved in these cases. The price range of $ 6.95 to $ 8.95 for cassettes made from the subject masters was disproportionately high for the length and quality of the product. Retailers commonly receive a minimum of 40-percent discount from the retail price on audio cassette tapes. Sales to wholesalers or to large chains would be discounted 50 to 55 percent from the retail price. After production and distribution costs, the owner of one of the subject masters could expect a royalty of between 25 and 90 cents per cassette sold. A lessee would be entitled to a percentage of that amount, in this case 30 percent under the lease agreement. Maximum lifetime sales for the Spruce Fork masters would range from a low of zero to a high of 50,000. Tapes with multiple readers would have a higher value than tapes with a single reader. Remastering the tapes, to equalize recording times and eliminate some of the noise, would enhance value. Remastering would cost approximately $ 3,000 per tape. The uniform values assigned to the master recordings were unrealistic. Each title would have a different value based upon its own market *655 potential. We find the value of the tapes leased by the partnerships from Spruce Fork was $ 15,000 per tape, except for Hard Times, which was worth $ 20,000. James Mason
Petitioner James Mason was chosen by the parties as a typical investor to represent the partnerships formed in 1981. With respect to the 1981 partnerships and investors, the partnership audit and litigation provisions added to the Internal Revenue Code by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 648, ( section 6221 et seq., I.R.C.), do not apply. In 1981, Mason obtained a 9.10798-percent interest in Iowa. For the taxable year ending December 31, 1981, Iowa partners were advised that the partnership had claimed basis in new property qualifying for an ITC of $ 1,355,000. Mason's share was $ 123,413. Mason was (and still is) an economics professor. He also advised on marketing and product design in the firearms industry. He was not experienced in the production or distribution of audio cassette tapes. His investment in Iowa was based on Smith's advice that it was a good tax and investment program, and an article in Forbes magazine about books on cassette. Mason did *656 not attempt to verify the accuracy of Smith's representations. He did not know Smith to be an expert in the audio tape industry. Mason had known Smith since 1978, when Smith first prepared Mason's income tax return. Smith had earned a good reputation for placing clients in real estate investments. Mason also discussed the investment with his colleagues. The tax advantages were an integral consideration in investing. Mason could not use all the ITC on his 1981 return. On his individual income tax return for 1982 he carried over $ 1,870 in unused ITCs from Iowa. Iowa reported a loss on its 1982 partnership return of $ 35,079, based on gross receipts of $ 21 and a deduction for a lease payment to Spruce Fork of $ 35,100. Mason claimed $ 3,195 as his distributive share of the loss on his 1982 Federal income tax return. Smith, for Mason's 1982 taxable year, prepared and signed a Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return, for Mason's 1982 return, dated April 15, 1983. In the space for 1982 tax liability, Smith wrote "unknown," for amounts withheld Smith wrote "unavailable," and for amount due, Smith wrote "unknown." Mason *657 signed his return for 1982 on August 15, 1983, and it was received by respondent's Fresno Service Center on August 17, 1983. Respondent, in a July 31, 1987, notice of deficiency, disallowed the losses and credits claimed through Iowa Partners III. Respondent also determined that Mason was liable for a section 6651(a)(1) addition for late filing of $ 533.75. By amendment to his answer, respondent also alleged that Mason was liable for the additions for negligence, section 6653(a)(1) and (2), and overvaluation under section 6659, and subject to additional interest on tax-motivated transactions, section 6621(c). By stipulation, petitioner agreed to go forward with the evidence on the additions to tax and additional interest, as though respondent had determined them in the notice of deficiency for Mason. Diego Investors IV/Beach Investors 400
Diego's partnership return for the taxable year ending December 31, 1983, reflected deductions for lease payments and promotion expenses of $ 31,650 and $ 15,000, respectively, and a net loss of $ 34,650. Also reflected was a basis in property qualifying for the ITC of $ 1,200,000. The expenses, loss, and basis are all partnership items *658 within the meaning of section 6231(a)(3). Respondent mailed a Notice Of Final Partnership Administrative Adjustment (FPAA) to Smith on March 9, 1987, disallowing the expenses, losses, and the ITC and underlying basis. Beach's partnership return for the taxable year ending December 31, 1983, reflected deductions for management fees, lease payments, and promotion expenses of $ 990, $ 13,700, and $ 6,000, respectively. Beach also reflected a basis in property qualifying for the ITC of $ 515,000. For 1983, Beach reflected a net loss of $ 20,690. The expenses and basis in ITC property are partnership items within the meaning of section 6231(a)(3). Respondent, in an FPAA mailed February 23, 1987, determined that the deductions and credit were not allowable. James Maxham, Vernon and Phyllis Payton, and Frank and Rosemary Mendoza filed a petition for Beach as partners other than the tax matters partner. Rosenberg Expert Testimony
Prior to trial and pursuant to Rule 143(f), respondent listed Albert Rosenberg (Rosenberg) as a potential expert witness. Respondent exchanged Rosenberg's report with petitioners and submitted a copy to the Court. Petitioners subpoenaed Rosenberg's *659 appearance at trial. When called at the trial session, Rosenberg declined to testify as an expert for petitioners. Petitioners wished to rebut Rosenberg's report but would not offer Rosenberg's report as expert testimony on behalf of petitioners. Likewise, respondent did not offer Rosenberg as his witness or offer Rosenberg's report as testimony. Rosenberg did not have direct or personal knowledge of any transactional facts in this case. OPINION The issues in these cases generally concern whether petitioners have properly claimed losses and claimed ITCs related to the master recording venture. Respondent has attacked the transactions on a number of alternative and sometimes overlapping grounds -- lack of economic substance and profit objective, and failure to substantiate the value or basis and the amount "at risk" (section 465) regarding the tapes for ITC purposes. A threshold issue is whether the transactions lacked economic substance and, if so, whether the activities were conducted with a profit objective. See secs. 162, 165, 183; *660 Gregory v. Helvering, 293 U.S. 465 (1935). If so, no credits or losses are allowable. Petitioners must show (1) that the transaction had economic substance consonant with the intended tax effects, and, if so, (2) that they had an actual and honest objective of making a profit. We have used an integrated test involving objective factors to resolve such inquiries. McCrary v. Commissioner, 92 T.C. 827 (1989); Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). There are a number of indicia in this record reflecting that these ventures were "generic tax shelters," lacking in economic substance. Tax benefits were the focus of the promotional materials. A large portion of one set of materials was devoted to the tax opinion. In addition, the prospectus promised a 400-percent write-off, with no notes to sign. The only detailed projections in the prospectus involved the amount of deductions and tax credits from a specified investment. Finally, both Mason and Smith testified they took into account the anticipated tax benefits from the transaction. *661 Rose v. Commissioner, 88 T.C. at 412; McCrary v. Commissioner, supra.
One of the most important considerations in this type of transaction is the fair market value of the asset, and in turn, the lease, in relation to the amounts claimed. "[T]he fundamental issue in these cases generally will be whether the property has been 'acquired' at an artificially high price, having little relation to its fair market value." Estate of Franklin v. Commissioner, 544 F.2d 1045, 1046 n.1 (9th Cir. 1976), affg. 64 T.C. 752 (1975). In large part, it is the value of the asset, whether purchased or leased, upon which the economic viability of a venture rests. A lease is merely the use of an asset for a portion of the asset's useful life. We do not consider the fact that the purchase of the master tape was one "generation" removed from petitioners' investment vehicle to obscure value as a crucial factor. Petitioners reference Soriano v. Commissioner, 90 T.C. 44 (1988), for the proposition that fair market value of the asset is not a good indicator of profitability to a lessee. In that case, however, we stated *662 that fair market value, in and of itself, was not a good indicator of profitability. Additionally, in Soriano two different analyses were necessary, one for the purchaser and one for the lessee. An active market for price or value comparison existed for energy management devices at issue in that case, which most accurately measured fair market value. Profitability to the lessees here, however, must be derived from a discounted cash flow analysis, because no general audio master tape lease market existed, or at least its existence was not included in the record. In this case, there was no market for either master tapes or master tape leases. Here, the lease value is derivative of the asset value. The value of an asset, such as the master audio tapes, may be determined based on the expected stream of income. An estimated number of unit sales could be projected over the life of the audio tapes. An actual owner of the tapes would compute value by multiplying the profit per tape -- after manufacturing and distribution costs -- by the reasonably projected sales (disregarding the time value of money). The multilevel lease transaction operates on the same principles. The lessee *663 determines value and profitability by multiplying the profit per tape -- after manufacturing costs, distribution expenses, and lease charges -- by the projected sales, limited to the life of the lease. Under the agreements in this case, the lease values would be 30 percent of the value of the master recordings, the amount the lessee retained under the leases. There must also be a reasonable relationship between the rental payments and the value of the asset leased. For example, in Soriano v. Commissioner, supra, one factor in determining lack of profit objective was that advanced rental, in the first year, exceeded the fair market value of the device itself. We have found that the master recordings had values of $ 15,000 or $ 20,000 each. (Because Hard Times had 4 readers, we found it was worth $ 20,000.) Under an income stream approach, the $ 15,000 figure implies royalties of 60 cents per tape on lifetime sales of 25,000 tapes. This is consistent with our other findings of between zero and 50,000 in sales for each tape and royalties of between 25 and 90 cents. As confirmed by the evidence, $ 1.35 was unrealistically high for the royalty. In addition, *664 $ 1.35 was set arbitrarily, with no relationship to costs and expenses of distribution or to the value of the tapes. Also, the distribution contracts, including the royalty, were renegotiable every year. Finally, the tapes, given their nature and quality, would not command the designated retail prices further lessening the possibility of sufficient royalties. Sales projections were also unrealistically high given that (1) the classics market was relatively small, (2) the quality of the tapes was poor, and (3) the titles were all in the public domain. If these tapes had been even moderately successful, they would have spawned contemporaneous competition. The $ 15,000 value represents at least 5 to 6 times the direct costs of production, and 2 to 3 times the cash and short-term note portion of the price paid by Spruce Fork. Palmer testified that the cash and short-term notes were enough to pay for direct and indirect costs, and a profit to the production entities. The values claimed, in excess of $ 200,000, are exaggerated when compared with production costs. The master tapes, created at a relatively small cost prior to the transactions at issue, were substantially overvalued. *665 Rose v. Commissioner, 88 T.C. at 412-413.
Finally, Spruce Fork deferred a substantial portion of the purchase price with long-term notes. The 1981 notes bore interest at 8 percent when the prime rate was near 20 percent. Similarly, the 1982 and 1983 notes bore interest at the same rate. The prime rate did not drop below 10 percent until 1984 or 1985. At a minimum, with no knowledge of audio tapes, an individual with limited business acumen would be able to recognize that the value of the notes and tapes was less than the claimed obligations. Goldstein v. Commissioner, 89 T.C. 535 (1987); McCrary v. Commissioner, 92 T.C. at 846-847. This overvaluation extends to the lease agreements. Under the leases, the lessee partnerships would be entitled to 30 percent of the proceeds from exploitation. Therefore, the value of the leases to the partnerships would not exceed approximately $ 4,500 per master recording ($ 6,000 for Hard Times). The lease agreements lasted for 10 years out of the masters' projected 12-year useful life. The partnerships paid approximately $ 14,000 to Spruce Fork and Scarlet or HAB for an arrangement worth *666 approximately $ 4,500. Therefore, this venture was not economically viable, even if considered on a cash-only basis. Moreover, the first 2 years' rental payments nearly equalled the actual value of the masters. The partnerships had no further obligations with respect to the lease agreements. In addition, the bulk of the consideration purportedly paid by Spruce Fork was in the form of 10-year notes. These notes allowed the partnerships to claim sufficient property basis for ITC purposes, which was well in excess of the fair market value of the master recordings. The notes were solely secured by the master recordings and were only enforceable against Spruce Fork, a corporation ostensibly with assets consisting of overvalued master recordings. It is unlikely that Spruce Fork would be either able or required to pay the notes, except to the extent there were sales or profits from the tapes. The notes were, in substance, contingent or nonrecourse. Rose v. Commissioner, 88 T.C. 386, 412-413 (1987). Neither the individual partners nor Smith obtained any independent appraisals of the master recordings or the leases. Independent indicators of profitability could have *667 been probative elements in a finding of economic substance. Beck v. Commissioner, 85 T.C. 557, 572 (1985); Elliot v. Commissioner, 84 T.C. 227, 240 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). Smith was not an expert in the production or distribution of audio tapes. This lack of expertise was reflected by Scarlet's amateur and poor quality packaging and the abortive marketing efforts. Considering the packaging and product of Scarlet and its predecessor, we conclude that only a relatively small number of each title would have been sold. Similarly, HAB and the "hear-a-book" concept were new and without a prior track record when Smith recommended it to the individuals and partnerships. The sales, lease, and distribution contracts did not comport with the industry standards for such contracts. Finally, the tapes were of poor quality relative to the expected $ 6.95 to $ 8.95 retail price. This shows a lack of expertise on the part of the taxpayers and their advisors. *668 Soriano v. Commissioner, supra.
Sales of the tapes have been nominal. In fact, for the test case involving Diego, the tapes have not been marketed. Although Smith testified that sales approximated 200,000 units, that figure is not supported by the record. Moreover, that figure, even if substantiated, only amounts to approximately 1,000 copies per title of the 200 or so titles distributed by Scarlet and leased by the partnerships. These nominal sales amounts further support our conclusion that, as packaged, Scarlet would not sell many, if any, cassettes. Smith did spend much time, effort, and money in marketing the tapes, which would, in theory, also benefit the partnerships. He discontinued his tax practice in 1984 to devote full time to Scarlet. However, the perspective of the lessee and the distributor would be different. Economic profit would be determined according to different criteria. For example, based on Smith's testimony about his expenses and our findings regarding expected sales, Scarlet could earn a profit even if the partnerships did not. [3] From another perspective, Smith received 25 to 26 percent of the leased amounts as commissions, which *669 would equal $ 450,000, assuming commission income of $ 3,000 per title for 150 titles. (Maxham also formed some of the partnerships and received some commissions.) Even though Smith claimed a $ 100,000 loss attributable to Scarlet, he stood to gain due to the commission income. We conclude that the audio literature transactions were without economic substance. Aside from the marketing effort, which was amateurish and was not likely to be successful, given the low *670 quality of the tapes, this transaction is not distinguishable from a number of other cases involving audio master tapes where deductions and credits have not been allowed. McCrary v. Commissioner, 92 T.C. 827 (1989), and cases cited therein at 841. There is additional support for respondent's disallowance of losses and credits to petitioners. Credits are passed from lessor to lessee (assuming a valid election is made) as if the lessee had acquired the property at a price equal to fair market value. Sec. 48(d)(1)(A). We have found that the fair market value of the master recordings was $ 15,000 each, except for Hard Times, which had a $ 20,000 value. Thus, the ITCs would have been limited to 10 percent of those amounts. Soriano v. Commissioner, supra.In addition, it is doubtful that Spruce Fork ever intended to pay or that the Palmer entities would collect on the long-term promissory notes. The tapes' inherently low value and the fact that Palmer had already made a profit on the short-term notes and cash, militate against any finding that the notes constituted genuine indebtedness which would be includable in basis. *671 Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). Admissability of Expert Testimony
At trial, we did not allow Albert Rosenberg, an expert selected and paid by respondent, to testify as petitioners' witness. Apparently, petitioners wished to use some of Rosenberg's assumptions concerning average sales of 50,000 tapes per title and refute the remainder of Rosenberg's conclusions and report which were unfavorable to petitioners. Petitioners basically argue, in a footnote to their brief, that nothing prevents them from doing so. Rule 143(f) provides that a party wishing to utilize an expert witness shall cause the expert to prepare a written report for submission to the Court and the opposing party. The report, if offered, may become the expert's direct testimony. As a preliminary matter, petitioner did not cause respondent's expert to prepare a written report and accordingly did not literally comply with Rule 143(f). Moreover, petitioners were unwilling to offer the report, prepared on behalf of respondent as direct testimony, on petitioners' behalf. One purpose of exchanging expert reports is to *672 facilitate effective cross-examination by the other party. However, in this case petitioners simply wish to enhance their tactical position by using selected portions of their opponent's expert's report, which their opponent has not offered as direct testimony or in support of his position. The Advisory Committee that drafted the Federal Rules of Civil Procedure expressed a desire to avoid indirect use of an opponent's expert. "A party must as a practical matter prepare his own case * * * for he can hardly hope to build his case out of his opponent's experts." Advisory Committee Note to Fed. R. Civ. P. 26(b)(4). Kaufman v. Edelstein, 539 F.2d 811 (2d Cir. 1976), is the leading case involving compelling an expert witness to testify. The court, noting that there is no privilege for expert testimony, nonetheless listed a number of factors in considering whether the expert should be excused from testifying in a particular case: the degree to which the expert is being called because of his knowledge of facts relevant to the case rather than in order to give opinion testimony; the difference between testifying to a previously *673 formed or expressed opinion and forming a new one; the possibility that, for other reasons, the witness is a unique expert; the extent to which the calling party is able to show the unlikelihood that a comparable witness will willingly testify; the degree to which the witness is able to show that he has been oppressed by having continually to testify; and undoubtedly, many others. [539 F.2d at 822.] Rosenberg was an expert, not a fact witness. He was not involved with the Spruce Fork transactions. Even if Rosenberg's expert report was the basis for the notice of deficiency, we will not look behind the notice of deficiency to examine the evidence used by respondent or the propriety of his motives or administrative policies or procedures in making the determinations reflected in the notice. Crowther v. Commissioner, 269 F.2d 292, 293 (9th Cir. 1959), revg. on other grounds 28 T.C. 1293, 1301 (1957); Petzoldt v. Commissioner, 92 T.C. 661 (1989). More importantly, petitioners have offered their own experts and have not shown that they were deprived of an expert by not being able to use Rosenberg. Judging from the other *674 two expert witnesses presented by the parties, Rosenberg's expertise was not unique. In addition, as we noted at trial, petitioners called Rosenberg in order to refute his opinion, not affirm it, so that he was not really petitioners' witness. Therefore, our refusal to compel Rosenberg to testify as an expert for petitioner was appropriate.[4] As a final matter, the use of expert testimony is within the discretion of the trial judge. The test for admissibility of expert testimony is whether the testimony will aid the trier of fact to understand the evidence. United States v. Amaral, 488 F.2d 1148 (9th Cir. 1973); Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir. 1969). Here, the expert was not being offered for that purpose, but instead for a matter of out-of-context conjecture or opinion which may have supported one party's position. Finally, the expert report or the portion sought to be used had no independent factual foundation and, accordingly, Rosenberg could not be offered as a fact witness. *675 Additions to Tax
James Mason was chosen by the parties as the typical investor in the audio literature program for purposes of the deficiencies and additions to tax. Therefore, to the extent this opinion involves individual partners directly, as opposed to the TEFRA partnerships, our redeterminations also apply to those individuals. In addition, we expect that our analysis with respect to the additions to tax will likely apply to individual partners in the TEFRA partnerships, should such nonpartnership items become contested. The additions to tax are not partnership items but affected items, under the partnership litigation rules, and must be determined subsequent to this proceeding. N.C.F. Energy Partners v. Commissioner, 89 T.C. 741 (1987). Petitioners, by stipulation, agreed to go forward with the evidence with respect to the additions to tax, even though respondent asserted that the additions (except section 6651(a)(1)) should apply in his amended answer. Section 6651(a)(1)
Respondent, in the notice of deficiency, determined the late filing addition for petitioner James Mason's 1982 income tax. *676 Section 6651(a)(1) provides an addition to tax equal to 5 percent per month (not to exceed 25 percent) for each month after a return is required but not filed. Mason claims that Smith prepared a Form 4868, Application for Automatic Extension of Time to File, and mailed it to respondent prior to the due date for Mason's 1982 return. Petitioner introduced a copy of the Form 4868, signed by Smith and dated April 15, 1983. Section 6081 provides that the Secretary may grant a reasonable extension of time for filing a return. Section 1.6081-4, Income Tax Regs., provides for an automatic 4-month extension if the taxpayer files a Form 4868 on or before the due date of the return showing the full amount of estimated tax and accompanied by payment of any estimated tax shown. Under section 7502, if a document required to be filed on or before a prescribed date is delivered to the appropriate agency by United States mail after such date, the postmark date is deemed to be the date of delivery. Besides Smith's testimony, there is no proof of a postmark date or mailing date prior to the due date for the return. Similarly, petitioner lacks proof that the extension, if timely mailed, was ultimately *677 delivered. Petitioner has not met his burden of proving he filed for an extension. Cf. Estate of Wood v. Commissioner, 92 T.C. 793 (1989). Further, reliance on Smith to timely file an extension is not reasonable cause within the meaning of the statute, since petitioner ultimately had the duty to meet the statutory deadline. United States v. Boyle, 469 U.S. 241 (1985). Finally, the Form 4868 listed Mason's estimated tax as unknown and amounts withheld as unavailable. Under these circumstances neither petitioner nor Smith made a bona fide and reasonable attempt to estimate tax liability, a stated prerequisite to a proper application for an extension. Sec. 1.6081-4, Income Tax Regs.; Crocker v. Commissioner, 92 T.C. 899, 908 (1989). Accordingly, we hold that petitioner Mason is liable for the addition to tax under section 6651(a)(1). Section 6653(a)
Section 6653(a)(1) provides an addition to equal to 5 percent of the underpayment if any part of any underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides an addition equal to 50 percent of the interest on the portion *678 of the underpayment attributable to such negligence or intentional disregard. The partnerships and investors relied on Smith to make all the business decisions regarding the master recording venture. This included the value of the master tapes upon which the feasibility of the entire venture rested. Further, both Smith and Mason knew that the value of the master recordings was critical to the amount of the investment ITC claimed on the returns. Neither Smith nor petitioner attempted to obtain any independent appraisals of the leases or the masters themselves. In addition, Smith was not experienced in the production or distribution of audio cassette tapes. Mason also filed his return late without reasonable cause, which can be considered negligent. Emmons v. Commissioner, 92 T.C. 342 (1989). Finally, the master recording venture promised approximately $ 21,000 in tax credits and $ 14,000 investment. No reasonable person would have trusted this scheme to work without some independent support. Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court; *679 McCrary v. Commissioner, 92 T.C. 827 (1989). Therefore, we find that petitioner is liable for the section 6653(a)(1) and (2) additions to tax. Section 6659
Section 6659 provides, in part, for an addition to tax equal to 30 percent of the underpayment of tax attributable to an overvaluation of more than 250 percent. The underpayment must be more than $ 1,000. Two hundred ten to two hundred sixty-five thousand dollars is substantially more than 250 percent of $ 20,000, the value of the most valuable master recording. The disallowed credits result in underpayments of more than $ 1,000. Because the fair market value of the master recording is an integral part of the fair market value of the lease, crucial to our lack of economic substance determination, the understatement linked to the disallowed credits is attributable to a valuation overstatement. McCrary v. Commissioner, supra.Thus, the section 6659 addition applies to the disallowed credits. Petitioner argues that the appraisals constituted a reasonable basis for the valuations. In addition, he argues that he was not concerned with fair market value of the assets themselves, only *680 profitability under the leases. Petitioner cannot hide behind or rely upon the lessor under section 48(d) to substantiate value and avoid the section 6659 addition. Soriano v. Commissioner, 90 T.C. 44, 60 (1988). The appraisals also do not assist petitioner. They were provided by the promoter and were all essentially pro forma, being substantially similar or identical in form. Neither Mason nor Smith made any independent investigation as to value. Both Mason and Smith knew the importance of value in claiming the ITCs on the partnership and individual income tax returns. The value of the master recordings claimed on the returns exceeded by 10 times a reasonable fair market value. Therefore, we also find no reasonable basis for the valuations claimed. In addition, as previously indicated, the importance of the fair market value of the leased asset, in determining fair market value and profitability of the lease, belies petitioner's claims that value of the asset was not important. Moreover, as a practical matter we do not believe that petitioner would have invested without the accompanying inflated ITC. Petitioner is responsible for his report of tax to the *681 Government, including the claimed value of the master recordings, and is responsible for the resulting overvaluation and addition to tax. Additional Interest - Section 6621
The final issue is the additional interest imposed on tax-motivated transactions by section 6621(c). The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax-motivated transaction includes any valuation overstatement, as defined in section 6659. Sec. 6621(c)(3)(A)(i). In addition, section 6621(c)(3)(A)(v) includes sham or fraudulent transactions within the scope of the additional interest section. Included in such transactions are those without economic substance. Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. *682 Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Because the underpayments in this case were attributable to valuation overstatements and transactions lacking in economic substance, the additional interest applies. To reflect the foregoing, Decisions will be entered for the respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith: Beach Investors 400, James Maxham, Vernon L. and Phyllis Payton, Frank and Rosemary Mendoza, A Partner Other Than the Tax Matters Partner, docket No. 25289-87; and James D. Mason, docket No. 35488-87.↩
2. With respect to docket No. 16947 involving the 1983 tax year of Diego Investors - IV, E.C. Smith, Tax Matters Partner, respondent disallowed $ 93,300 in claimed losses and determined that $ 1,200,000 in property was not eligible for investment tax credits. With respect to docket No. 25289-87 involving the 1983 tax year of Beach Investors 400, James Maxham, Vernon L. and Phyllis Payton, Frank and Rosemary Mendoza, A Partner Other Than the Tax Matters Partner, respondent disallowed claimed losses in the amount of $ 41,380 and determined that $ 515,000 in property was not eligible for investment tax credits. Concerning docket No. 35488-87, which involves James D. Mason, respondent determined a $ 2,423 income tax deficiency and also determined or asserted additions to tax under Internal Revenue Code sections 6651(a)(1), 6659, 6653(a)(1), and 6653(a)(2) in the respective amounts of $ 533.75, $ 561.00, $ 121.15, and 50 percent of interest payable on so much of the $ 2,423 underpayment that may be decided for the 1982 taxable year. Respondent, for 1982, also asserted the additional interest on tax-motivated transactions pursuant to section 6621(c)↩.
*. In the case of the Diego and Beach partnerships, only a composite price is available.↩
3. Smith testified that after royalties he would have $ 1.80 per tape to cover production and administrative costs. Subtracting 90 cents for production leaves 90 cents for administrative costs. Assuming lifetime sales of 10,000 per title over a period of 10 years for 200 or so titles averages to projections of approximately 17,000 unit sales per month. This would generate $ 15,300 per month to cover administrative costs of Scarlet. Smith projected administrative costs of $ 4,000 to $ 6,500 per month, leaving a $ 9,000 per month profit. In addition, while actual overhead was often higher than expected, Scarlet also received $ 2,500 to $ 3,000 in distribution fees per title, not included in the income figure.↩
4. Even if we had accepted the 50,000 unit sales figure contained in Rosenberg's report, it would not help petitioners or change the outcome of these cases. The partnerships received 30 percent of a maximum 90-cent royalty, or 27 cents. Therefore, for an approximate $ 14,000 per title investment, petitioners, over a period of 10 years, would have received 50,000 times 27 cents or $ 13,500.↩