Joseph HALEK, Plaintiff–Appellee, Cross–Appellant,

v.

UNITED STATES of America, Defendant–Appellant, Cross–Appellee.

Nos. 98–3432, 98–3560.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1999.

Decided May 19, 1999.

Charles E. Webster, Chicago, IL, for Plaintiff–Appellee in No. 98–3432.

Matthew D. Tanner (argued), Office of the United States Attorney, Civil Division, Chicago, IL, for Defendant–Appellant in No. 98–3432.

Marvin A. Brustin (argued), Chicago, IL, for Plaintiff-Appellant in No. 98–3560.

Thomas P. Walsh, Office of the United States Attorney, Civil Division, Chicago, IL, for Defendant–Appellee in No. 98–3560.

Before POSNER, Chief Judge, and BAUER and ROVNER, Circuit Judges.

POSNER, Chief Judge.

Joseph Halek sued the United States under the Federal Tort Claims Act for injuries that he sustained while servicing an elevator at the Great Lakes Naval Training Center. After a bench trial, the district judge, applying the tort law of Illinois (made applicable to this case by the Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674; *Molzof v. United States*, 502 U.S. 301, 305, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992)), found that the Navy had been negligent, but reduced Halek's damages by 20 percent to reflect Halek's own negligence, yielding a $1.4 million judgment. Both parties have appealed, but Halek's appeal requires only the briefest of mentions; he complains not about the 20 percent reduction in his damages because of his contributory fault but about the district judge's deducting pension and fringe benefits that Halek obtained from his employer as a consequence of the accident. In particular, the accident forced him to retire, thus accelerating the receipt of his pension. The government argues that since he could have retired then even if he hadn't been disabled from working by the accident, he didn't lose any wages as a result of the accident. But the evidence was that he wouldn't have retired then, and so he did lose those wages, along with the more generous pension benefits that he would have received had he deferred his retirement to the normal retirement age. As he points out, a tortfeasor is not permitted to credit compensation that his victim receives from another ("collateral") source as a consequence of the tort. *Wilson v. Hoffman Group, Inc.*, 131 Ill.2d 308, 137 Ill.Dec. 579, 546 N.E.2d 524, 530 (1989). Halek paid, directly or indirectly, for the employee benefits that were triggered by the accident; the tortfeasor should not be permitted to appropriate those benefits by being allowed to offset them against what he owes his victim. That would both unjustly enrich the tortfeasor and reduce the deterrent effect of tort liability. But Halek failed to argue the point in the district court, and so it is not available to him on appeal.

The government's appeal, while conceding as it must that a landowner or land occupier has a duty of care to a business invitee, such as an elevator serviceman, argues that the duty is not violated by a hazard that is obvious to the invitee. Some hazards are so perspicuous that their mere existence is an adequate warning and thus discharges the landowner's duty of care. E.g., *Bucheleres v. Chicago Park District*, 171 Ill.2d 435, 216 Ill.Dec. 568, 665 N.E.2d 826, 836 (1996); *Genaust v. Illinois Power Co.*, 62 Ill.2d 456, 343 N.E.2d 465, 472 (1976); *Hoesly v. Chicago Central & Pacific R.R.*, 153 F.3d 478, 481

(7th Cir.1998) (applying Illinois law); *Restatement (Second) of Torts* § 343A(1) and comment e (1965). Was this such a case? The facts are not in dispute. Halek, an experienced elevator mechanic, performed routine maintenance once or twice a week on the elevators of one of the buildings in the naval base. The machinery for the elevators is housed in a small room at the top of the building. Cables connected to the roof of each elevator are looped over a large pulley which is turned by a motor, causing the elevator to rise or fall. Anyone who caught his hand between the pulley and the cables while the pulley was rotating away from the hand and thus pulling it into the "nip point" where the cables meet the pulley could suffer a grievous injury. The Navy had decided therefore to install an aluminum mesh cage around each pulley. But the cage did not surround the pulley completely. It enclosed it on three sides but left the space directly in front of the pulley unguarded. The reason, presumably, was that because the cage was bolted to the floor and therefore difficult to remove to get at the pulley, the mechanics would have had difficulty working on the pulley assembly had the cage gone all around it.

Halek had shut off the power to do some work on the elevator machinery and in the course of this work he mislaid a bolt. After he finished the work and turned the power back on he noticed the bolt lying in the narrow space between the pulley and the aluminum mesh cage. Had the cage not been there, Halek could easily have retrieved the bolt from the side; the bolt would have been between the pulley and him. But with that access blocked by the cage, Halek had to reach around the cage, to the open space in front of the pulley, and when he tried to do this his glasses caught in the mesh and when he tried to adjust them he tripped and his hand caught in the pulley—which was now moving, because someone had summoned the elevator just as Halek was reaching for the bolt.

The cage was dangerous, primarily because it was bolted to the floor. Had it been easily removable, Halek could have removed it and then retrieved the bolt from the side, with complete safety. Because the cage was not easily removable, he could retrieve the bolt only by reaching around the cage and in dangerous proximity to the pulley and cables, which might start to move at any time if someone summoned the elevator. Given the gravity of the injury that was likely to occur to anyone who fell into the machinery, the non-trivial probability of getting caught in unshielded machinery if one is working in close proximity to it, and the trivial expense of making the cage easily removable and therefore safe, the district judge was justified in finding that the Navy had been negligent. See, e.g., *Deibert v. Bauer Bros. Construction Co.*, 141 Ill.2d 430, 152 Ill.Dec. 552, 566 N.E.2d 239, 244 (1990); *American National Bank & Trust Co. v. National Advertising Co.*, 149 Ill.2d 14, 171 Ill.Dec. 461, 594 N.E.2d 313, 320 (1992).

■ Unless the danger was so obvious to the people working on the elevator machinery, or so easily avoidable by them (Halek had only to turn off the power to be entirely safe in reaching for the bolt), that the probability of an accident was really quite negligible. For in that event the failure to take precautions against such an accident might not have been negligent, cheap as those precautions would have been. Negligence is a function of the likelihood of an accident as well as of its gravity if it occurs and of the ease of preventing it, e.g., *Jackson v. TLC Associates, Inc.*, 185 Ill.2d 418, 235 Ill.Dec. 905, 706 N.E.2d 460, 463 (1998); *Bucheleres v. Chicago Park District, supra*, 216 Ill.Dec. 568, 665 N.E.2d at 836–37; *McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1556–57 (7th Cir.1987) (applying Illinois law); *Bammerlin v. Navistar Int'l Transportation Corp.*, 30 F.3d 898, 902 (7th Cir.1994); *Liriano v. Hobart Corp.*, 132 F.3d 124, 131 n. 12 (2d Cir.1998); *United States v. Car-*

*roll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947) (L.Hand, J.), and the obviousness of a risk may make the likelihood of its materializing so slight that there is no need to try to eliminate the risk. That is the insight behind the "open and obvious" rule of negligence law, a "rule" that the Illinois courts now treat as a consideration in applying the negligence standard, *Ward v. K mart Corp.*, 136 Ill.2d 132, 143 Ill.Dec. 288, 554 N.E.2d 223, 228–32 (1990); *Deibert v. Bauer Bros. Construction Co.*, *supra*, 152 Ill.Dec. 552, 566 N.E.2d at 245, rather than as a defense. If the danger of an accident is itself a sufficient, and costless, warning, there may be no need for the potential injurer to take (additional) precautions. The incremental benefits would be negligible; they would not exceed the costs.

■■ Ordinarily the danger posed by unshielded machinery is obvious in the sense just explained, the sense that makes "open and obvious" a critical and often a controlling factor in assessing negligence. E.g., *Estrada v. Schmutz Mfg. Co.*, 734 F.2d 1218 (7th Cir.1984); *Malinder v. Jenkins Elevator & Machine Co.*, 371 Pa.Super. 414, 538 A.2d 509, 515 (1988); cf. *Anderson v. P.A. Radocy & Sons, Inc.*, 67 F.3d 619, 623 (7th Cir.1995); *LeSuer v. United States*, 617 F.2d 1197, 1200 (5th Cir.1980). But not always, *McDonald v. Sandvik Process Systems, Inc.*, 870 F.2d 389, 393–94 (7th Cir.1989), and perhaps not here. The specific danger was not that of sticking one's hand in the clearly visible nip point between pulley and cables; it was losing one's balance while reaching for something lying in the cramped space between the aluminum mesh cage and the pulley assembly. The danger could be averted by turning off the power; but a person who did not recognize the danger would not take this precaution, and we cannot say with sufficient confidence to warrant overturning the trial judge's finding (which would require us to pronounce it *clearly* erroneous, e.g., *Jackson v. United States*, 156 F.3d 230, 234 (1st Cir.1998))

that the danger was so obvious that the Navy could not be thought negligent for having created the cramped space by making the aluminum mesh cage difficult to remove—that, in other words, the danger was warning enough to eliminate any significant risk of injury.

■ A factor often neglected in the analysis of negligence is the propensity of a precaution against one type of accident to increase the probability of another type. That effect is properly regarded as a cost of the precaution. But the government does not argue that a removable cage surrounding the pulley would have been dangerous because cleaning people might remove it to clean and then find themselves in greater danger of falling into the machinery than if the cage were fastened down but one side left open. Perhaps the optimal solution would be a removable cage with a sign warning that it should not be removed without turning off the power. We need not pursue the issue. The government's backup argument is different; is that even if the Navy was negligent, Halek was more negligent; and under Illinois law an accident victim can recover nothing if his negligence exceeded the injurer's. 735 ILCS 5/2–1116 (1994 ed.). (The current version of 5/2–1116 is inapplicable, having become effective after Halek's accident.) A danger, though in one sense open and obvious, might yet be the sort of danger against which a prudent potential injurer would take some precautions because of the risk of potential victims' being distracted, e.g., *Ward v. K mart Corp., supra*, 143 Ill.Dec. 288, 554 N.E.2d at 232–33, and so the failure to take those precautions would be negligence; and yet the potential victim might in the circumstances have acted imprudently as well, and so the negligence of the parties would have to be compared.

■ We would have a difficult case if the government were arguing only that the trial judge's 20 percent deduction from Halek's damages to reflect his contribution to the accident was too low—that Halek's negligence was clearly (for this is another

issue governed by the clearly-erroneous rule, *Wolkenhauer v. Smith*, 822 F.2d 711, 717 (7th Cir.1987); *Jackson v. United States, supra*, 156 F.3d at 235) at least 33 or 40 percent responsible for the accident. The government has instead decided to go for broke, requiring us to find (if we are to reverse on the basis of Halek's negligence) that Halek was more responsible for the accident than the Navy. We cannot do that with enough confidence to overturn another finding that comes to us protected by the clearly-erroneous rule. Halek was indeed careless, though not in tripping and falling into the pulley assembly, which could have happened to anyone, given the awkward placement of the aluminum mesh cage, but rather in failing to turn off the power first. Of course there is a certain reluctance to shut down an elevator even when that can be done, as it could be done here, without trapping a passenger. The power control indicated whether the elevator doors were open, and if they were, then the elevator had to be on one of the floors (and thus not moving) rather than between floors, so a cessation of power would not result in the passenger's being trapped in the elevator, something no one likes. But even when there is no danger of trapping a passenger, turning off the power interrupts the elevator service and this no one is eager to do. (There were, though, two elevators.) Nevertheless, given the proximity of the orphaned bolt to the pulley, and the cramped area that Halek would have to enter in order to retrieve the bolt, prudence dictated that he shut off the power, since the elevator might start up, and hence the pulley start rotating, at any time; and this he failed to do. But to call this failure *more* negligent than the Navy's failure to design a proper cage would require us to make the kind of guess that is reserved to the finder of fact, other than in hopelessly one-sided cases, which this is not, or in any event not quite.

AFFIRMED.