# United States Tax Court

T.C. Memo. 2023-60

BENJAMIN SOLEIMANI AND SHARYN SOLEIMANI,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 8884-13.                          Filed May 15, 2023.

————

*Carlos F. Ortiz*, *Mayling C. Blanco*, and *Matthew D. Lee*, for petitioners.

*Shawna A. Early*, *Lydia A. Branche*, and *Marc L. Caine*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, *Judge*: Respondent determined a deficiency in petitioners' 2007 federal income tax of $414,193 and a section 6662(a) accuracy-related penalty of $82,839.[1] Petitioners resided in New York when they timely filed a Petition seeking a redetermination of the deficiency. The issue for decision is whether petitioners are entitled to long-term capital loss deductions relating to three parcels of real property allegedly confiscated by the Iranian government.[2]

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts have been rounded to the nearest dollar.

[2] The deficiency at issue arises from respondent's disallowance of a $2,725,000 long-term capital loss deduction from the confiscation claimed on petitioners' 2007 federal income tax return, and computational adjustments related to that

[*2]                       FINDINGS OF FACT

The parties filed Stipulations of Facts and accompanying Exhibits, which we incorporate by this reference.

*Petitioner-Husband's Experience with Iran*

Petitioner-husband (petitioner) was born in Iran but left in the early 1960s and immigrated to the United States. He became a permanent resident of the United States in 1964 and began filing U.S. federal income tax returns that year. Petitioner returned to Iran once around 1976. During this visit he was detained for approximately 30 days. This was the last time he had been in Iran as of the time of trial.

Following an Islamic revolution in 1978 and 1979, Shah Mohammad Reza Pahlavi (Shah) was ousted from power, and the Islamic Republic of Iran was proclaimed on April 1, 1979. Iranians affiliated with the Shah's regime were subject to imprisonment, arrest, and execution. Petitioner and his family were considered supporters of the Shah, and petitioner was deemed a deserter at the beginning of the Islamic Revolution. Petitioner maintains that since his trip around 1976 he has been unable to travel to Iran because he fears abduction, imprisonment, or execution were he to return.

*History of Allegedly Expropriated Properties*

Petitioner claims that three unimproved parcels of real estate in Tehran, Iran (Iranian properties), were purchased by his uncle on his behalf and registered under his name in 1976, 1977, and 1978, respectively. Petitioner claims that these properties were purchased for 180 million rials ($2,608,695),[3] 110 million rials ($1,594,202),[4] and 95

disallowance. Petitioners subsequently filed an amended return on which the claimed long-term capital loss deduction from the confiscation was increased to $5,579,708, entitling them to a refund. Respondent denied the refund claim simultaneously with the issuance of the notice of deficiency.

In their Petition, petitioners also claim that petitioner Sharyn Soleimani is entitled to relief under section 6015, but they made no mention of that claim at trial or on brief and are deemed to have abandoned it.

[3] At this time, the official rate of exchange for one U.S. dollar was 70.35 Iranian rials.

[4] At this time, the official rate of exchange for one U.S. dollar was 70.48 Iranian rials.

**[*3]** million rials ($1,376,811),[5] respectively. According to petitioner, he learned of these purchases during a trip to London in 1981. At that time, he claims, his uncle told him the general location of each property and advised petitioner that he could obtain specifics for each property at the registry of deeds in Tehran. According to petitioner, the Iranian properties were undeveloped and he made no improvements to them.

Petitioner testified that in approximately 2006 he became interested in selling the Iranian properties. He sought the help of a friend, Witness 1.[6] Witness 1 lived in the United States but maintained contacts in Iran and frequently traveled there. On petitioner's behalf, Witness 1 made a series of inquiries regarding title to the Iranian properties. Petitioner claims that through that process Witness 1 confirmed that the Iranian properties were still titled in petitioner's name. According to petitioner, in 2007, while in the process of trying to sell the Iranian properties, he was contacted by a real estate broker hired by Witness 1. This real estate broker allegedly claimed to have discovered that at some point during 2007, title to the properties had been changed from petitioner to the Iranian government.

Petitioner claims that in an effort to ascertain the ownership status of the properties, he agreed that Witness 1 would retain the services of Mohammad Ali Soltanpour, an Iranian attorney. According to petitioner, and confirmed by Witness 1 in his testimony, Witness 1 secured the services of and communicated with Mr. Soltanpour. While petitioner testified that he never met with or spoke to Mr. Soltanpour, Witness 1 testified that Mr. Soltanpour accompanied him to inspect the three properties and thereupon agreed to attempt to obtain records documenting their confiscation by the Iranian government. Mr. Soltanpour thereafter allegedly obtained from Iranian officials a document from the "State Organization for the Registration of Deeds and Real Estates," dated September 24, 2008 (Registration), and a "Declaration Sheet" from the "Justice Administration of the Islamic Republic of Iran (Central Branch)," dated October 16, 2008 (Declaration). Both documents described the Iranian properties as

---

[5] At this time, the official rate of exchange for one U.S. dollar was 70.48 Iranian rials.

[6] Witness 1 testified without concern about revealing his identity in the initial trial proceedings. However, in a subsequent trial proceeding he maintained that any disclosure of his identity and role in assisting petitioner might subject him to reprisals from Iranian officials. We exercised our discretion to seal those portions of the record that might further reveal his identity.

[*4] having been acquired by petitioner in December 1976, November 1977, and April 1978, respectively. The documents each further recounted that the properties had been confiscated by the Islamic Republic of Iran through a verdict of the Islamic Revolutionary Court and new title deeds issued accordingly. The Declaration further stated the values of each property in Iranian rials and U.S. dollars. The Declaration also noted that it had been issued at the request of Mohammad Ali Soltanpour, attorney for petitioner, and gave Mr. Soltanpour's bar license number and address.

According to petitioner and Witness 1, Mr. Soltanpour gave the Declaration to Witness 1, who in turn gave it to petitioner. According to petitioner, Mr. Soltanpour discovered that petitioner's properties were confiscated by the Islamic Republic of Iran pursuant to an order issued by the 16th Branch of the Islamic Revolutionary Court under No. 87/D/5614 on April 15, 2007. Petitioner claims that this order was thereafter approved on June 9, 2007, by the Special First Branch of the Special Court for Investigating Article 49 of the Constitution of the Islamic Republic of Iran. The Declaration provides both the basis for the confiscation order and a description of the confiscated properties.

*Examination of 2007 Return*

Petitioners filed a joint federal tax return for 2007 in which they claimed the $2,725,000 long-term capital loss deduction previously noted and subsequently filed an amended return that increased the amount to $5,579,079. They allege the loss arose from the expropriation by the Iranian government of the Iranian properties in 2007.

The 2007 return was examined and the claimed capital loss deduction was proposed to be disallowed. The revenue agent conducting the examination also made an initial determination that the substantial understatement penalty described in section 6662(d) should be imposed. She prepared a Civil Penalty Approval Form in order to obtain her supervisor's approval of the penalty's imposition. In the box on the Form labeled "Reason(s) for Non-Assertions of Penalty(s)" she wrote: "The agent as [sic] considered and applied substantial understatement penalty per Section 6662." The box on the Form labeled "Reason(s) for Assertions of Penalty(s)" was left blank. Below these boxes was a box labeled "Group Manager Approval to Assess Penalties Identified Above" with a signature line labeled "Group Manager Signature." The signature of the revenue agent's immediate supervisor, a group manager, appears on the signature line and is dated February 9, 2012.

[*5] On that same day the group manager also signed the so-called 30-Day Letter advising petitioners of the proposed changes to their 2007 return and of the penalty under section 6662, and the letter was mailed that day to petitioners.

The aforementioned Civil Penalty Approval Form also included a table listing "Penalties Requiring Group Manager Approval," a list of penalties thereunder that included "6662(d) Substantial Understatement," and a vertical column titled "Assert Penalty Yes No" with boxes adjacent to each penalty allowing "Yes" or "No" to be marked. The revenue agent marked both "Yes" and "No" in the boxes adjacent to the "6662(d) Substantial Understatement" entry. Every other penalty listed on the Form had only the "No" box adjacent to it checked.

Respondent subsequently issued a notice of deficiency determining that petitioners had not established entitlement to the loss deduction claimed on the 2007 return and were liable for a section 6662 penalty. Respondent also simultaneously rejected petitioners' claim for refund on the amended return.

*Trial Proceedings*

At trial petitioners introduced the Registration and the Declaration to substantiate their claimed capital loss deduction. Petitioners also introduced the report of an expert witness which concluded that, on the basis of the expert's experience in the practice of Iranian law, the Registration and the Declaration substantiated that the Iranian properties were expropriated by the Iranian government in 2007.

After trial, the Court reviewed the Registration and the Declaration, including comparing the legal description of the subject properties therein with judicially noticed maps of Tehran, Iran. A comparison of those maps and the Iranian documents' property descriptions revealed several apparent, significant discrepancies.

The Court directed petitioners to file a report addressing these discrepancies. In response petitioners—without leave of Court or compliance with Rule 143(g)—submitted a supplemental expert report prepared by their expert witness in which he offered explanations for the apparent discrepancies. Given the prejudice to respondent of the Court's considering petitioners' additional expert testimony without cross-examination or any other opportunity for rebuttal, the Court

**[\*6]** conferred with the parties and proposed that respondent be permitted to engage his own expert. The parties agreed.

Respondent engaged an expert and submitted his report. Respondent's expert's report concluded inter alia that Mohammad Ali Soltanpour was a fictitious person. He visited the addresses listed for Mr. Soltanpour in Tehran; no one at those addresses had any knowledge of anyone by that name. He tried the phone numbers listed for Mr. Soltanpour and encountered the same. Finally, he researched Iranian Bar Association listings and found no entry for anyone by that name. Indeed, the bar number given for Mr. Soltanpour on the Declaration had never been issued to anyone, according to Iranian Bar Association records. The Report further concluded that the Registration and the Declaration were forgeries because, inter alia, they were purportedly issued to a nonexistent Iranian attorney with a fictitious bar number, they stated property values in U.S. dollars, and two of the properties referenced in the documents as owned by petitioner before their confiscation by the Iranian government could in fact be traced in Iranian property records, and those records showed that the properties had at no time been owned by petitioner or the Iranian government. (Respondent's expert was unable to find any records pertaining to the third property.)

A supplemental trial was conducted to afford petitioners an opportunity to cross-examine respondent's expert and to receive additional evidence pertaining to the apparent discrepancies identified in respondent's expert's report.

OPINION

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The taxpayer bears the burden of proving entitlement to any deduction or credit claimed. *Segel v. Commissioner*, 89 T.C. 816, 842 (1987).[7]

---

[7] Although petitioners contend in their opening brief that the burden of proof should shift to respondent pursuant to section 7491(a), as more fully discussed hereinafter, they have failed to introduce any "credible evidence" as provided in that section with respect to any factual issue underlying their capital loss claim. Accordingly, the burden of proof does not shift to respondent.

**[\*7]**    The issue for decision is whether petitioner suffered losses from expropriation in the year claimed.  Losses sustained during the taxable year for which no compensation is received may be deducted under section 165(a).  However, in the case of individuals, section 165(c) limits the deduction to losses incurred in a trade or business or any transaction entered into for profit, except in the case of losses arising from casualty or theft.  In order to be deductible, losses must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year.  *Boehm v. Commissioner*, 326 U.S. 287, 291–92 (1945); *United States v. S.S. White Dental Mfg. Co. of Pa.*, 274 U.S. 398 (1927); Treas. Reg. § 1.165-1(b).  A loss is deductible only for the taxable year in which it was sustained.  Treas. Reg. § 1.165-1(d)(1); *see also Moshrefzadeh-Sani v. Commissioner*, T.C. Memo. 1992-592.

The basis for determining the amount of the deduction for any loss pursuant to section 165(a) is the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of the property.  § 165(b).

Petitioners presented documents at trial that purported to substantiate petitioner's claimed ownership of the Iranian properties, their values, and their expropriation by the Iranian government in 2007.  However, on the basis of the report and testimony of respondent's expert, we find that the documents are forgeries and that the Iranian lawyer petitioners claimed to have relied on to obtain the documents was also a fabrication.  We reach these conclusions for the reasons which follow.

Confronted with respondent's expert's findings that there was no record of an Iranian attorney named Mohammad Ali Soltanpour with the bar number, phone numbers, or addresses listed on the Declaration, petitioners took the position for the first time at the supplemental trial that Mr. Soltanpour was in fact an alias for an attorney who did the work under an assumed identity for fear of reprisals from the Iranian government if he were discovered assisting petitioner.  This claim is difficult to square with the testimony of Witness 1, who at the original trial testified that he had inspected the Iranian properties with Mr. Soltanpour.  During the further trial proceedings, however, Witness 1's recollection of Mr. Soltanpour was less clear; he claimed to be uncertain whether he had interacted with Mr. Soltanpour directly or instead with an Iranian real estate professional.  Given Witness 1's obvious trimming of his testimony to meet the newly discovered

[*8] evidence of Mr. Soltanpour's fictitious status, we do not credit his testimony in any respect. We likewise find unworthy of belief the newfound claim at the supplemental trial that an actual Iranian attorney using an alias procured the Registration and the Declaration.

Of even greater relevance to the Registration's and the Declaration's authenticity, the claim that the documents were obtained by an attorney using an alias and a fictional bar number is too improbable to accept.[8] Neither respondent's expert nor petitioner's expert believed that an attorney using an alias and a fictional bar number would have been able to obtain such documents from Iranian government officials. Thus, even petitioners' own expert effectively concedes that there is significant doubt as to their authenticity.

Moreover, the Declaration states the values of the purportedly confiscated properties both in Iranian rials and U.S. dollars. Both respondent's expert and petitioner's expert testified that it would be highly unusual for Iranian government documents of this nature to state any values in U.S. dollars. Neither had seen any similar document do so in their experience.

Finally, respondent's expert was able to trace the ownership of two of the three Iranian properties that petitioner claimed belonged to him and had been confiscated. Respondent's expert's research revealed that those two properties had never been owned by petitioner and/or the Iranian government. Respondent's expert was unable to find any record of the third property. Petitioners offered no real response to this research; their expert merely reiterated his claim that, on the basis of his experience examining similar documents, the Registration and the Declaration were authentic. When an expert offers a conclusory opinion without providing the reasoning and facts to support it, it is entitled to little weight. *See Malachinski v. Commissioner*, 268 F.3d 497, 504–05 (7th Cir. 2001), *aff'g* T.C. Memo. 1999-182.

In sum, there is substantial evidence that the Registration and the Declaration are forgeries, and we so find. As these documents were petitioners' principal means of substantiating their claim that petitioner

---

[8] The Declaration on its face is issued to Mr. Soltanpour and lists the bar number that petitioners now concede is fake. While the Registration does not name Mr. Soltanpour, both petitioner and Witness 1 testified at the original trial that Mr. Soltanpour obtained the document, and according to respondent's expert, a stamp on the Farsi version of the document indicates that the original version is in the possession of Mr. Soltanpour.

[*9] owned the Iranian properties and that they were confiscated by the Iranian government in 2007, petitioners have failed to show entitlement to deduct capital losses in either the amounts claimed on their original 2007 return or in their claim of an overpayment embodied in their amended return for that year.

*Penalties*

### *Section 6662(a) Accuracy-Related Penalty*

The notice of deficiency also determined that petitioners are liable for a substantial understatement penalty for 2007. An accuracy-related penalty of 20% is imposed on any portion of an underpayment of tax required to be shown on a return that is attributable to any substantial understatement of income tax. § 6662(a), (b)(2). An understatement for this purpose is generally the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax imposed which is shown on the return. § 6662(d)(2)(A). An understatement is substantial when it exceeds the greater of 10% of the tax required to be shown on the return for the taxable year, or $5,000. § 6662(d)(1)(A). However, the substantial understatement penalty may not be imposed with respect to any portion of an underpayment as to which the taxpayer shows that he acted with reasonable cause and in good faith. § 6664(c)(1).

The Commissioner bears the burden of production with respect to a taxpayer's liability for a section 6662(a) penalty and must produce evidence that the imposition of the penalty is appropriate. *See* § 7491(c); *see also Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). This burden of production includes producing evidence establishing that the penalty was personally approved (in writing) by the immediate supervisor of the individual making such a determination. § 6751(b)(1); *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016).

Respondent has met his burden of showing that imposition of the substantial understatement penalty is appropriate, as we have sustained his asserted deficiency of $414,193, which exceeds 10% of the amount of tax required to be shown on petitioners' 2007 return.

To fulfill the requirements of section 6751(b)(1), respondent offered a Civil Penalty Approval Form prepared by the revenue agent who conducted petitioners' examination and signed by her immediate supervisor. Petitioners contend that the Form does not meet the burden

**[*10]** of production because it has numerous defects that render it ambiguous with respect to demonstrating written supervisory approval.

Petitioners point to two boxes at the top of the Form, one titled "Reason(s) for Non-Assertions of Penalty(s)" (Non-Assertion box) and the other titled "Reason(s) for Assertions of Penalty(s)" (Assertion box). The Form provides a further explanation of the Non-Assertion box; namely, that where a deficiency case is involved: "Explanation required when adjustments made and penalties are not asserted. The applicable exceptions to the penalty must be documented." The Form provides no further explanation with respect to the Assertion box (presumably because it is deemed self-explanatory).

In documenting her assertion of the substantial understatement penalty, the revenue agent erroneously placed her explanation in the Non-Assertion box, as follows: "The agent as [sic] considered and applied substantial understatement penalty per Section 6662." The Assertion box is left blank.

The box for the group manager approval (Approval box) is labeled as follows: "Group Manager Approval to Assess Penalties Identified Above . . . (And for non-assertion of Substantial Understatement Penalty where dollar criteria for penalty has been met)." The signature of the revenue agent's immediate supervisor, a group manager, has been placed in this box.

Petitioners argue that because the Assertion box is blank, the Form is "devoid of any explanation at all" for the assertion of the substantial understatement penalty. We disagree. Examined in its entirety, the Form fairly conveys an intention to assert the penalty, although concededly the revenue agent erroneously placed her explanation in the Non-Assertion box. Moreover, the Form calls for an explanation only when the dollar criteria for the substantial understatement penalty have been met and the penalty is *not* asserted.

Petitioners further argue that, given the absence of an entry in the Assertion box and the presence of an entry in the Non-Assertion box, and the fact that the Approval box by its terms may be used to signify the approval of the assertion or the non-assertion of penalties identified in the boxes above, it is unclear whether the group manager was approving a penalty or the non-assertion of the substantial understatement penalty. Again, we disagree for essentially the same reason. We find that the Form as filled out, notwithstanding the entry

**[\*11]** of an explanation in an erroneous box, clearly evinces an intention to assert the substantial understatement penalty and was so understood by the group manager signing it. Thus, written approval to assert the penalty was obtained.

Finally, petitioners argue that an ambiguity exists by virtue of the manner in which the revenue agent filled out a box titled "Penalties Requiring Group Manager Approval." The box lists eight penalties, including the substantial understatement penalty, as well as an "Alternative Penalty Position." A column adjacent to the penalty entries is headed "Assert Penalty" with "Yes" and "No" boxes for each penalty. As filled out by the revenue agent, the Form at issue has the "No" box checked for every penalty, including the substantial understatement penalty. However, the substantial understatement penalty—and only that penalty—also has the "Yes" box checked. Petitioners argue that an ambiguity is created by virtue of the fact that both the "Yes" and "No" boxes have been checked with respect to the assertion of the substantial understatement penalty. However, given that a check in the "Yes" box appears *only* with respect to the substantial understatement penalty, and the "No" box is checked with respect to all listed penalties, we are satisfied that the revenue agent's execution of the Form, while sloppy, does not create any ambiguity sufficient to vitiate the group manager's approval. In short, the "Yes" adjacent to the substantial understatement penalty stands out in relation to all other penalties and evinces an intent to assert that penalty and not any other.

For the foregoing reasons, we are satisfied that the Civil Penalty Approval Form proffered by respondent demonstrates compliance with section 6751(b)(1).

Petitioners also contend that they are not liable for the substantial understatement penalty because they had reasonable cause for the underpayment within the meaning of section 6664(c)(1) in that they relied in good faith upon the professional advice of their return preparer. However, taxpayers claiming such reliance must show that they provided accurate information to their adviser. *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). Petitioners assert that they provided the Registration and the Declaration to their return preparer. We have found those documents to be forgeries. Thus, petitioners' failure to provide accurate information to their adviser is fatal to their reasonable cause defense.

12

[*12] *Fraud Penalty*

Although we have found that the documents petitioners proffered to respondent and the Court to substantiate their claims are forgeries, we do not apply a fraud penalty in this case for the following reasons. Respondent waited until the end of the supplemental trial proceedings to orally move for leave to amend the pleadings to assert a fraud penalty. We denied respondent's Motion because petitioners would have suffered undue prejudice if respondent's Motion had been granted. At a minimum, petitioners were entitled to notice and an adequate opportunity to elicit testimony and present evidence to rebut respondent's fraud allegations. *See Julicher v. Commissioner*, T.C. Memo. 2002-55, slip op. at 23. For example, on this record we are unable to determine whether petitioner intentionally submitted forgeries or instead was duped by Witness 1 and actually believed the Registration and the Declaration were genuine. We note in this regard that petitioner testified in the initial trial proceeding that he had not actually met Mr. Soltanpour, well before Mr. Soltanpour's fictional status came to light. By contrast, Witness 1 testified in the initial proceedings that he had personally met with Mr. Soltanpour and only later changed his testimony to equivocate on this point.

*Conclusion*

Petitioners have failed to prove that the claimed expropriation losses were sustained during the year in which they allegedly occurred. Therefore, petitioners are not entitled to the capital loss deduction they claimed. We also conclude that petitioners are liable for a section 6662(a) and (b)(2) substantial understatement penalty.

We have considered all of petitioners' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*